# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **JOHN E. FALOBA, et al.,** | **Case No. 4:24-cv-01569 (lead case)** |
| | **Case No. 4:24-cv-01574** |
| **Plaintiffs,** | **Case No. 4:24-cv-01577** |
| **-vs-** | |
| | **JUDGE PAMELA A. BARKER** |
| **ULTIUM CELLS LLC, et al.,** | |
| | **MEMORANDUM OPINION AND** |
| **Defendants.** | **ORDER** |

Currently pending before this Court are five Motions to Dismiss filed in three consolidated cases.  Plaintiffs[1] John E. Faloba ("Faloba"), Grant R. Howdershelt ("Howdershelt"), and James L. Antos ("Antos") each filed separate Complaints against Defendant Ultium Cells LLC ("Ultium" or "Ultium Cells"), Defendant General Motors Company ("GM"), and Defendant LG Energy Solution Michigan, Inc. ("LGES").   ("Faloba Complaint")[2] (Case No. 4:24-cv-01569, Doc. No. 9); ("Howdershelt Complaint") (Case No. 4:24-cv-01574, Doc. No. 1-1); ("Antos Complaint") (Case No. 4:24-cv-01577, Doc. No. 1-1).  The Howdershelt Complaint and Antos Complaint also asserted claims against Defendant Lake Erie Electric, Inc. ("LEE").  (Howdershelt Complaint at PageID #12; Antos Complaint at PageID #12.)

---

[1] Specifically, the Faloba Complaint was filed by eleven similarly situated plaintiffs.  (Faloba Complaint at PageID #58.) The Howdershelt Complaint was filed by Howdershelt and his wife, Devonna R. Howdershelt.  (Howdershelt Complaint at PageID #12.)   Antos is the sole plaintiff in the Antos Complaint.  (Antos Complaint at PageID #12.)   All three Complaints were originally filed in state court but were removed to federal court on September 13, 2024.  (Case No. 4:24-cv-01569, Doc. No. 1); (Case No. 4:24-cv-01574, Doc. No. 1); (Case No. 4:24-cv-01577, Doc. No. 1).

[2] On September 13, 2024, Faloba's initial Complaint was removed to this Court.  (Case No. 4:24-cv-01569, Doc. No. 1.) On October 10, 2024, Faloba filed an Amended Complaint, which is referred to herein as the "Faloba Complaint."  (Case No. 4:24-cv-01569, Doc. No. 9.)

Defendants GM and LGES jointly filed Motions to Dismiss each of the three Complaints. ("GM/LGES Faloba Motion") (Case No. 4:24-cv-01569, Doc. No. 13); ("GM/LGES Howdershelt Motion") (Case No. 4:24-cv-01574, Doc. No. 7); ("GM/LGES Antos Motion") (Case No. 4:24-cv-01577, Doc. No. 7).  The Faloba Plaintiffs, Howdershelt Plaintiffs, and Plaintiff Antos filed Opposition Briefs to each respective Motion.  ("Faloba Opposition to GM/LGES") (Case No. 4:24-cv-01569, Doc. No. 19); ("Howdershelt Opposition to GM/LGES") (Case No. 4:24-cv-01574, Doc. No. 13); ("Antos Opposition to GM/LGES") (Case No. 4:24-cv-01577, Doc. No. 16).  Defendants GM and LGES filed Reply Briefs to each Opposition.  ("GM/LGES Faloba Reply") (Case No. 4:24-cv-01569, Doc. No. 21); ("GM/LGES Howdershelt Reply") (Case No. 4:24-cv-01569, Doc. No. 17); ("GM/LGES Antos Reply") (Case No. 4:24-cv-01569, Doc. No. 16).  Accordingly, all three Motions are ripe for decision.

Additionally, Defendant LEE filed Motions to Dismiss the Howdershelt Complaint and the Antos Complaint.  ("LEE Howdershelt Motion") (Case No. 4:24-cv-01574, Doc. No. 11); ("LEE Antos Motion") (Case No. 4:24-cv-01577, Doc. No. 14).  Plaintiffs Howdershelt and Antos filed Opposition Briefs as to each respective Complaint.  ("Howdershelt Opposition to LEE") (Case No. 4:24-cv-01574, Doc. No. 15); ("Antos Opposition to LEE") (Case No. 4:24-cv-01577, Doc. No. 18). Defendant LEE filed Reply Briefs to each Opposition.  ("LEE Howdershelt Reply") (Case No. 4:24-cv-01569, Doc. No. 20); ("LEE Antos Reply") (Case No. 4:24-cv-01577, Doc. No. 19).  Accordingly, these two Motions are also ripe for decision.

This Opinion addresses the Motion to Dismiss filed by GM and LGES in the Faloba case. (GM/LGES Faloba Motion.)  The remaining Motions filed in the Howdershelt and Antos cases are

addressed in a separately issued opinion.[3] The term "Plaintiffs" in this Opinion thus refers to the Faloba Plaintiffs.

For the reasons set forth herein, the Court DENIES the GM/LGES Faloba Motion.

## I. Background[4]

The Faloba Complaint sets forth the following allegations.[5]

### A. Parties and General Battery Plant Information

"This is an action for personal injuries sustained by eleven (11) Plaintiffs who were injured as the result of an industrial accident that occurred on or about August 16, 2022, on the premises of a battery plant [(hereinafter the 'premises')] operated as a joint venture and in the custody and control of Defendants … in which hazardous chemical fumes were released …" (Faloba Compl. at ¶ 1.) Each of the eleven Plaintiffs was "working as an employee of a contractor at the premises." (*Id.*) According to Plaintiffs, the "hazardous chemical fumes were released as the direct and proximate result of the negligence of Defendants and one or more of Defendants' employees." (*Id.*)

Ultium Cells is a business entity licensed to do business in the State of Ohio and doing business in Trumbull County, Ohio as a manufacturing facility producing batteries for electric

---

[3] The Howdershelt and Antos Plaintiffs filed virtually identical Complaints, except that the Howdershelt Complaint asserts an additional claim against LEE for loss of consortium. Conversely, Plaintiffs in the Faloba case filed a Complaint containing similar allegations and claims but use different language to set forth these claims. Because the Court is required to evaluate the exact language of the Complaint on a motion to dismiss, the Court addresses the Faloba Complaint in this Opinion and addresses the Howdershelt and Antos Complaints in a separate opinion.

[4] In setting forth the background, the Court utilizes the language from the Faloba Complaint. *See supra* note 3. The Court addresses the allegations contained in the Howdershelt and Antos Complaints, and the Motions associated therewith, in a separately issued opinion. *See id.*

[5] For purposes of this Opinion, in setting forth the background relevant to Defendants' Motion to Dismiss, the Court accepts Plaintiffs' factual allegations as true and construes their Complaints in the light most favorable to them as the non-moving parties. *See Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).

vehicles.  (*Id.* at ¶ 13.)  According to Plaintiffs, Ultium Cells "holds itself out to the public as, and in fact is, a joint venture of [GM] and [LGES] for battery cell manufacturing at the Ultium [Cells] battery cell manufacturing facility in Warren, Ohio."  (*Id.* at ¶ 14.)

Specifically, "Ultium [Cells'] website states: 'Ultium cells LLC is the name of the [GM] and [LGES] joint venture for battery cell manufacturing … [at] the Ultium battery cell manufacturing facility in Warren.'"  (*Id.* at ¶ 15.)  The website further provides that "GM and LGES are not mere affiliates of [Ultium Cells], but rather were and are active 'COLLABORATION PARTNERS' on the 'One Ultium Team' responsible for 'product design and processes' and 'manufacturing best practices' at Ultium."  (*Id.* at ¶ 16.)  The website also "describes multiple executives or officers at Ultium [Cells], who had and have responsibility for plant operations, as long time GM executives."  (*Id.* at ¶ 17.)  According to Plaintiffs, "[a]s joint venturers, Defendants LGES and GM were actively involved in designing, planning, and installation of ovens, ventilation systems, and safety systems and for employee training at the Warren Ultium plant and actively participated in decisions regarding start-up operations, including the decision to commence operations while construction was ongoing."  (*Id.* at ¶ 18.)

### B.    The Chemical Exposure Incident

On or about August 16, 2022, Plaintiffs "w[ere] working as an employee of a contractor at the premises" and were each employed by either LEE, De-Cal Inc. dba De-Cal Mechanical, GDI Services, Inc., or Valley Electric Consolidated, Inc.  (*Id.* at ¶¶ 1–12.)  Plaintiffs were "performing various work and equipment installation for operations at the plant."  (*Id.* at ¶ 27.)

"During the time that Plaintiffs were working at the Ultium [Cells] plant on construction and installation work, battery manufacturing operations had already begun in areas adjacent to where

4

Plaintiffs were working, including operation of certain coating ovens." (*Id.* at ¶ 19.) Specifically, while Plaintiffs were working at the plant, Defendants had begun operations "including the operation of anode and cathode coating ovens in which chemical slurry is baked onto a foil substrate." (*Id.* at ¶ 28.) According to Plaintiffs, these "operations were designed, monitored, supervised, and/or conducted by employees employed by and/or under the control of Defendants," and "[d]uring such period of time employees who identified themselves as employees of GM or LGES or who wore vests or badges identifying themselves as such were present at the premises on a regular or daily basis." (*Id.* at ¶¶ 20, 28.)

"During operation of the ovens by employees employed by and/or under the control of Defendants, a tear in the foil occurred which led to the oven doors being opened for service by Defendants' employees." (*Id.* at ¶ 29.) "Following such service to the ovens, one or more employees employed by and/or under the control of Defendants failed to close the oven doors before restarting the ovens." (*Id.* at ¶ 30.) "As a result, chemically laced fumes escaped from the ovens and inundated the areas where Plaintiffs were working, causing them to be exposed to and inhale various hazardous and noxious fumes." (*Id.* at ¶ 31.) Plaintiffs allege that "as the result of the design, condition, and/or operation of the ventilation and emission control systems at the premises, hazardous and noxious fumes were not properly controlled, but were instead directed toward the area where Plaintiffs were working." (*Id.* at ¶ 32.)

"Plaintiffs and other persons on the premises were evacuated on the day of the exposure." (*Id.* at ¶ 33.) "However, Defendants permitted workers and contractors to return to the premises the following day with representations that the premises was safe." (*Id.*) Plaintiffs allege that "[a]t least one or more GM employees participated in investigation, air testing, and/or permitting workers to

return to the premises," and that "[f]ollowing the chemical exposures Defendant's [sic] wrongfully withheld and refused to provide critical data concerning the identity and nature of the chemical exposures."  (*Id.* at ¶ 33, 34.)  "Thereafter, some Plaintiffs experienced additional symptoms upon return to the premises."  (*Id.* at ¶ 33.)

Plaintiffs allege that "Defendants jointly operated and had custody and control of the premises where Plaintiffs were injured and the equipment, machinery, processes and procedures involved in and resulting in Plaintiffs' injuries and employed and exercised control over the employees and agents whose acts or omissions resulted in such injuries."  (*Id.* at ¶ 21.)  Prior to the incident, "other workers present on the premises of Ultium's Warren plant had suffered incidents of chemical exposure."  (*Id.* at ¶ 22.)  According to Plaintiffs, Defendants nevertheless "chose to expose Plaintiffs and other construction workers to the hazards created by commencing operations during construction and without proper training, systems, and processes."  (*Id.*)

As a result of the incident, Ultium Cells was "cited by the United States Department of Labor, Occupational Health and Safety Administration (OSHA) for multiple serious violations, including failure to ensure access to material safety data and failure to develop, document, and utilize procedures for control of hazardous energy."  (*Id.* at ¶ 35.)  Further, "OSHA conducted an investigation concluding that workers had been exposed to N-methyl-2-pyrrolidone (NMP) on August 16, 2022."  (*Id.* at ¶ 36.)  "OSHA issued a letter advising Ultium [Cells] to take steps to ensure ventilation is properly installed within the cathode coating area, to ensure that an adequate emergency plan is in place to assist employees in reporting any possible leaks within the cathode coating area and to ensure that new employees are trained on the hazards in their environment."  (*Id.* at ¶ 37.)  According to Plaintiffs, "[a]ll of the measures set forth in OSHA's recommendation were essential to

6

ensure a workplace free from recognized hazards likely to cause death or serious harm, and should have been implemented prior to exposing employees, workers, or other persons to such hazards." (*Id.* at ¶ 38.)

Plaintiffs allege that they were "business invitees" and "frequenters" on the premises of Defendants. (*Id.* at ¶¶ 39, 45.) According to Plaintiffs, "Defendants owed Plaintiff[s] the duties to keep the premises in a reasonably safe condition, to warn Plaintiffs of latent hazards, to inspect the premises, to take reasonable precautions to protect Plaintiffs from foreseeable hazards, and to use care not to negligently injure Plaintiffs." (*Id.* at ¶¶ 39, 47.) Further, Plaintiffs allege that "Defendants, by virtue of their participation in a joint venture are liable under Ohio law not just for any negligence or breach of care of their own, including that of their employees or agents, but for any such negligence or breach of care of each other, including that of their employees or agents." (*Id.* at ¶ 40.)

Plaintiffs allege that Defendants were negligent and breached their duties to Plaintiffs, including "negligence in design, installation, and/or operation of the coating ovens, failure to develop, document and implement procedures for control of hazardous chemicals, failure to train employees and implement appropriate safety procedures, failure to provide appropriate safety measures and equipment including proper ventilation and control interlocks, commencement of operation in proximity to plaintiffs, failure to inspect and monitor working conditions, including air quality, failure to warn of latest [sic] hazards, failure to provide information, including but not limited to, material safety data sheets, and negligence in permitting Plaintiffs to return to the premises prematurely." (*Id.* at ¶ 41.) As a result, "Plaintiffs have each suffered various personal injuries, including, but not limited to, toxic chemical exposure, bronchitis, and hyper reactive airway disease." (*Id.* at ¶ 42.)

## II.    Procedural History

7

On August 6, 2024, the Faloba Plaintiffs filed a Complaint in state court against Defendants Ultium Cells, GM, and LGES.  (Case No. 4:24-cv-01569, Doc. No. 1-1.)  On August 15, 2024, Howdershelt and Antos filed their Complaints in state court against Defendants Ultium Cells, GM, LGES, and LEE.  (Howdershelt Compl.; Antos Compl.)  On September 13, 2024, Defendants removed all three Complaints to this Court.  (Case No. 4:24-cv-01569, Doc. No. 1; Case No. 4:24-cv-01574, Doc. No. 1; Case No. 4:24-cv-01577, Doc. No. 1.)

On September 20, 2024, Ultium Cells filed an Answer to the Howdershelt and Antos Complaints.[6]  (Case No. 4:24-cv-01574, Doc. No. 6; Case No. 4:24-cv-01577, Doc. No. 6.)  That same day, GM and LGES filed their Motions to Dismiss the Howdershelt and Antos Complaints.[7]  (GM/LGES Howdershelt Motion; GM/LGES Antos Motion.)  On September 27, 2024, Antos filed a Motion to Remand to State Court.  (Case No. 4:24-cv-01577, Doc. No. 8.)  On October 10, 2024, the Faloba Plaintiffs filed an Amended Complaint.  (Faloba Compl.)  On October 18, 2024, Antos's Motion to Remand was denied.  (Case No. 4:24-cv-01577, Doc. No. 10.)  On October 24, 2024, Ultium Cells filed its Answer to the Faloba Complaint.  (Case No. 4:24-cv-01569, Doc. No. 12.)  That same day, GM and LGES filed their Motion to Dismiss the Faloba Complaint.  (GM/LGES Faloba Motion.)

On November 5, 2024, following a Motion to Consolidate filed by GM and LGES, all three cases were consolidated before this Court.  (Case No. 4:24-cv-01569, Doc. No. 15.)

---

[6] Ultium Cells also filed an Answer to Plaintiffs' initial complaint on this date.  However, Plaintiffs amended their Complaint shortly afterwards.  On October 24, 2024, Ultium Cells filed its Answer to Plaintiffs' Amended Complaint.  (Case No. 4:24-cv-01569, Doc. No. 12.)

[7] GM and LGES also filed a Motion to Dismiss the initial Faloba complaint on this date.  However, Faloba amended his Complaint shortly afterwards.  On October 24, 2024, GM and LGES filed a Motion to Dismiss Faloba's Amended Complaint.  (GM/LGES Faloba Motion.)

On November 4, 2024, both Howdershelt and Antos filed their Oppositions to GM/LGES's Motions to Dismiss.  (Howdershelt Opposition to GM/LGES; Antos Opposition to GM/LGES.)  On November 18, 2024, GM and LGES filed their Replies to Howdershelt and Antos's Oppositions.  (GM/LGES Howdershelt Reply; GM/LGES Antos Reply.)  On November 19, 2024, the Faloba Plaintiffs filed their Opposition to GM/LGES's Motion to Dismiss.  (Faloba Opposition to GM/LGES.)  On December 9, 2024, GM and LGES filed their Reply to the Faloba Plaintiffs' Opposition.  (GM/LGES Faloba Reply.)

On October 22, 2024, LEE also filed separate Motions to Dismiss the claims asserted against it in the Howdershelt and Antos Complaints.  (LEE Howdershelt Motion; LEE Antos Motion.)  On November 5, 2024, Antos filed his Opposition to LEE's Motion.  (Antos Opposition to LEE.)  On November 12, 2024, LEE filed its Reply to Antos's Opposition.  (LEE Antos Reply.)  On November 21, 2024, Howdershelt filed his Opposition to LEE's Motion.  (Howdershelt Opposition to LEE.)  On December 2, 2024, LEE filed its Reply to Howdershelt's Opposition.  (LEE Howdershelt Reply.)

The Faloba Complaint includes, in relevant part, a claim for negligence and a frequenter claim against Defendants Ultium Cells, GM, and LGES.  (Faloba Compl. at ¶¶ 26–49.)  These claims will be discussed below.

## III.    Standard of Review

Defendants GM and LGES move to dismiss Plaintiffs' claims as asserted against them under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Pursuant to Rule 12(b)(6), the Court accepts Plaintiffs' factual allegations as true and construes the Complaint in the light most favorable to Plaintiffs.  *See Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).  To survive a motion to

dismiss under this Rule, "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).

The measure of a Rule 12(b)(6) challenge—whether a complaint raises a right to relief above the speculative level—"does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555–56). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.  Specific facts are not necessary; the statement need only give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Gunasekera*, 551 F.3d at 466 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)) (internal quotation marks omitted).  Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, … it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

## IV.  Analysis

10

A. **Piercing the Corporate Veil**

The Court first addresses the parties' assertions regarding piercing the corporate veil.

In their Motion, Defendants assert that Plaintiffs have failed to plausibly allege the elements of the *Belvedere-Domborski* test to allow for piercing the corporate veil.  (GM/LGES Faloba Motion at PageID #146–47.)  In their Opposition, Plaintiffs respond that the arguments related to "piercing the corporate veil" are irrelevant because their claims are premised on the personal participation theory of liability rather than veil piercing.  (Faloba Opposition to GM/LGES at PageID #185–87.) In their Reply, Defendants focus their efforts on responding to the theories raised in Plaintiffs' Opposition—namely, the "personal participation theory" and "joint venture theory."  (*See generally* GM/LGES Faloba Reply.)

Generally, under Ohio law, "[a] person who is a member of a limited liability company is not liable, solely by reason of being a member, for a debt, obligation, or liability of the limited liability company or a series thereof …"  Ohio Rev. Code § 1706.26; *see also Ettayam v. Ramsey*, 2019 WL 952037, at *6 (10th Dist. 2019).  However, "[a] trial court may apply the doctrine of piercing the corporate veil to limited liability companies" to hold a "member of a limited liability company … personally liable."  *Denny v. Breawick, LLC*, 137 N.E.3d 578, 584 (3d Dist. 2019).

As explained above, however, Plaintiffs do not seek to hold GM and LGES liable "solely by reason of being a member" of Ultium Cells and its subsidiary.  § 1706.26.  Nor do Plaintiffs seek to pierce the corporate veil.  (*See* Faloba Opposition to GM/LGES at PageID #187.)  Rather, Plaintiffs assert that GM and LGES are liable under the personal participation theory of liability.  *See State ex. rel. Cordray v. Evergreen Land Dev., Ltd.*, 2016 WL 5408651, at *4 (7th Dist Sept. 27, 2016) ("The personal participation theory of liability is distinct from piercing the corporate veil …"); *Francisco*

11

*A. Mateo MD, Inc. v. Proia*, 227 N.E.3d 389, 421 (7th Dist. 2023) (same). According to Plaintiffs, GM and LGES are liable because of their independent conduct, rather than their mere membership status. *See, e.g.*, *Broadcast Music, Inc. v. Leyland Co., LLC*, 2012 WL 5879838, at *2 (N.D. Ohio Nov. 21, 2012) (finding that member of LLC's "alleged liability is not predicated solely upon his role as a member/manager of [LLC]" but instead "as an infringer along with [LLC]").

This Court concludes, then, that Plaintiffs do not advance any theory of piercing the corporate veil and have abandoned any arguments to that effect. (*See* Faloba Opposition to GM/LGES at PageID #185, 187 ("[The Complaint] does not seek to impose liability based upon mere membership … [Defendants] instead argu[e] irrelevancies about piercing the corporate veil.").) Therefore, the Court need not address the arguments pertaining to piercing the corporate veil. *See Cordray*, 2016 WL 5408651, at *4 (recognizing that piercing the corporate veil is distinct from the personal participation theory of liability).

**B.      Personal Participation Theory**

The Court instead turns to the parties' assertions regarding the personal participation theory. Rather than rely on piercing the corporate veil, Plaintiffs assert that GM and LGES are liable under the personal participation theory of liability. (Faloba Opposition to GM/LGES at PageID #185–88.) In response, GM and LGES raise two arguments. First, GM and LGES contend that the personal participation theory of liability only applies when the LLC member is an individual, and that the doctrine does not extend to corporate parents and affiliates. (GM/LGES Faloba Reply at PageID #208.) Second, even if the personal participation theory applies to GM and LGES, they maintain that Plaintiffs have failed to sufficiently plead that theory of liability. (*Id.* at PageID #208–09.) The Court will address each argument, below.

12

### 1. Whether the Personal Participation Theory Applies to GM/LGES

The first issue the Court must determine is whether the personal participation theory applies to GM and LGES—i.e., whether the personal participation theory is applicable when the LLC member is also a corporate entity.

In their Opposition, Plaintiffs contend that LLC members can be "liable for their personal participation in an endeavor without having to pierce the corporate veil." (Faloba Opposition to GM/LGES at PageID #185.) Plaintiffs assert that "[t]he fact that an LLC member may itself be a corporate entity does not alter the principle," and that the "individual participation theory has been repeatedly applied to corporate parents and affiliates." (*Id.* at PageID #186.) Accordingly, Plaintiffs submit that "[n]either the corporate shield nor a shield of limited liability insulates a wrongdoer from liability for his or her own tortious acts." (*Id.* at PageID #186–87.) In their Reply, GM and LGES assert that Plaintiffs' cited cases "do not extend the individual participation doctrine to corporate parents and affiliates," but instead address the "Good Samaritan" doctrine or negligent undertaking. (GM/LGES Faloba Reply at PageID #208.)

As previously explained, § 1706.26 provides, in relevant part, that "[a] person who is a member of a limited liability company is not liable, *solely by reason of being a member*, for a debt, obligation, or liability of the limited liability company or a series thereof, whether arising in contract, tort, or otherwise; or for the acts or omissions of any other member, agent, or employee of the limited liability company or a series thereof." § 1706.26 (emphasis added).

Although Ohio courts do not seem to have directly addressed the issue of whether the personal participation theory is applicable when the LLC member is also a corporate entity, one federal district

13

court analyzing a Kentucky statute[8] similar to § 1706.26 has applied the personal participation theory to LLCs. *See Dzurilla v. All American Homes, LLC*, 2010 WL 55923 (E.D. Ky. Jan. 4, 2010). In *Dzurilla*, claims were asserted against two limited liability companies: AAH and AAH-TN. *Id.* at *1. AAH-TN was a wholly owned limited liability company of AAH. *Id.* The defendants argued that they were "separate LLCs and that the elements of piercing the corporate veil have not been satisfied." *Id.* In response, the plaintiffs contended that it was "not necessary to pierce the corporate veil to hold AAH liable" because "AAH committed individual tortious conduct by allowing AAH-TN to manufacture modules under AAH's KIBS number without ensuring that the modules complied with the Building Code." *Id.* at *2.

The court concluded that a genuine issue of fact existed based on the personal participation theory. First, the court explained that defendants' "arguments regarding piercing the corporate veil ha[d] no relevance [because] [p]laintiffs did not allege that the corporate veil should be pierced." *Id.* at *3. Rather, the court concluded that a "member of an LLC can be held liable for its individual conduct, without regard to the limited liability status of the corporation or company." The court acknowledged that "[w]hile mere status as a manager of an LLC will not subject a person to liability, the statute does not preclude liability for the manager's own tortious conduct." *Id.* (citing Ky. Rev. Stat. Ann. § 275.150). Accordingly, given that plaintiffs asserted that "AAH committed individual tortious conduct," the court concluded that both AAH and AAH-TN could be separately liable

---

[8] Ky. Rev. Stat. Ann. § 275.150 is similar to the Ohio statute applicable to this case in that it provides, in relevant part, that "no member, manager, employee, or agent of a limited liability company, including a professional limited liability company, shall be personally liable by reason of being a member, manager, employee, or agent of the limited liability company …" Ky. Rev. Stat. Ann. § 275.150.

14

because a genuine issue of material fact existed "as to whether AAH is liable to [p]laintiffs for its *individual acts* or its acts as an agent." *Id.* (emphasis added).

The Court finds *Dzurilla* to be persuasive. First, the focus of the Ohio statute is that a member of a limited liability company should not be liable "*solely by reason of being a member*." § 1706.26 (emphasis added). Second, Ohio courts routinely permit liability when an LLC member's individual conduct constitutes tortious activity,[9] and nothing in the statute indicates that this well-established rule draws a distinction between that member being an individual as opposed to an LLC. Just as in *Dzurilla*, Plaintiffs allege that GM and LGES committed separate and individual tortious conduct from Ultium Cells. (Faloba Opposition to GM/LGES at PageID #185–88.) If proven true that GM and LGES were actively involved and actively participated in the allegedly tortious conduct independent of Ultium Cells, that could support independent liability for GM and LGES separate from the liability of Ultium Cells. (*See, e.g.*, Faloba Compl. at ¶ 18.)

Accordingly, following *Dzurilla*, this Court declines to find that Ultium Cells and GM/LGES cannot each be liable for their own independent conduct simply because GM and LGES are LLC members rather than individual members.[10]

## 2. Whether Plaintiffs Adequately Pled the Personal Participation Theory

---

[9] *See, e.g.*, *Cordray*, 2016 WL 5408651, at *6–7 (referencing participation of individual LLC members in tortious conduct and upholding their personal liability "on the basis of personal participation").

[10] GM and LGES dispute the applicability of Plaintiffs' cited authority, *Root v. Stahl Scott Fetzer Co.*, 88 N.E.3d 980 (8th Dist. 2017), on the basis that *Root* involved the "Good Samaritan" doctrine rather than the personal participation theory. Even if the Court were to disregard *Root*, however, a plain reading of § 1706.26 prevents members of an LLC from being liable "*solely* by reason of being a member"—not for their independent tortious conduct. As explained above, it is well-established that individual members of an LLC can be liable for their independent tortious conduct, and the Court is not persuaded to depart from this rule on the mere distinction that the member happens to be another LLC which committed the "independent tortious conduct" rather than an individual who did so.

The Court next turns to whether Plaintiffs have adequately pled the personal participation theory of liability as to GM and LGES.  Specifically, GM and LGES assert that Plaintiffs have not met the pleading requirements under *Twombly* and *Iqbal* for two reasons: (1) Plaintiffs' allegations "fail[] to specify the harms allegedly caused by each of the [i]ndividual Defendants" by only pleading "collective conduct"; and (2) Plaintiffs' allegations of GM and LGES's breach of duties are a conclusory "formulaic recitation of the elements."  (GM/LGES Faloba Reply at PageID #209–10.)  The Court will evaluate each argument below.

### a. Whether Pleading "Collective Conduct" is Proper Under Rule 8

The Court first turns to GM and LGES's argument that pleading "collective conduct" is impermissible under Rule 8.  As explained previously, "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'"  *Tackett*, 561 F.3d at 488 (quoting *Twombly*, 550 U.S. at 555–56).  Moreover, "the statement need only give the defendant fair notice of what the … claim is and the grounds upon which it rests."  *Gunasekera*, 551 F.3d at 466 (quoting *Erickson v. Pardus*, 551 U.S. at 93) (internal quotation marks omitted).

The issue of "[w]hether 'group pleading' of defendants violates Rule 8(a) is often dependent on the facts and claims at issue."  *Igo v. Sun Life Assurance Co. of Canada*, 652 F. Supp.3d 929, 935 (S.D. Ohio 2023) (citing cases).  A complaint violates the pleading requirements of Rule 8 when it fails to specify the harms allegedly caused by each individual defendant.  *See Niederst v. Minuteman Capital, LLC*, 2024 WL 3522413, at *5 (N.D. Ohio July 24, 2024).  Courts have found complaints that contain "conclusory allegations of collective, unspecified, and undifferentiated wrongdoing" and that "vaguely lump[] all defendants together without providing any factual allegations that specify

16

separate acts" to fall short of Rule 8 pleading requirements. *Kurek v. Ohio Dep't of Dev. Disabilities*, 2017 WL 1555930, at *6 (N.D. Ohio Jan. 20, 2017); *see also Niederst*, 2024 WL 3522413, at *5.

However, "[p]ursuant to Rule 8, the Sixth Circuit permits plaintiffs to group defendants together in the allegations in their complaint so long as it gives the defendants notice of the claims against them and the grounds upon which it rests." *Shah v. Fortive Corp.*, 2024 WL 3226108, at *5 (S.D. Ohio June 27, 2024). Indeed, district courts within this circuit have concluded that "a group pleading may state a claim against … collectively defined defendants where plaintiff plausibly alleges facts showing entitlement to relief for the claimed misconduct." *Gold Crest, LLC v. Project Light, LLC*, 525 F. Supp.3d 826, 835 (N.D. Ohio 2021); *see also Hale v. Enerco Grp., Inc.*, 2011 WL 49545, at *4 (N.D. Ohio Jan. 5, 2011) (denying motion to dismiss where plaintiffs plausibly alleged defendants engaged in the same conduct); *Freedom Banc Mortg. Services, Inc. v. O'Harra*, 2012 WL 3862209, at *4 (S.D. Ohio Sept. 5, 2012) (finding that blanket allegations against "Defendants" throughout complaint were sufficient under Rule 8 because it was plausible that multiple defendants engaged in, or assisted in, the alleged misconduct).

Thus, where "[p]laintiffs have made allegations that multiple [d]efendants have engaged in the same conduct, those allegations are plausible and raise a reasonable expectation that discovery will reveal evidence to support their claims." *Hale*, 2011 WL 49545, at *4; *Shah*, 2024 WL 3226108, at *5 n.6; *Freedom Banc Mortg. Services, Inc.*, 2012 WL 3862209, at *4. Accordingly, "collecting [defendants] under a defined term then claiming all [defendants] are liable for the same misconduct is, at the pleading stage, sufficient to give each of them notice of the claims alleged against them." *Gold Crest, LLC*, 525 F. Supp.3d at 835; *see also Shah*, 2024 WL 3226108, at *5 ("At the pleadings

17

stage, the practice is sufficient where discovery will help expose who will have any actual responsibility.").

The Court finds that Plaintiffs' collective pleading style is not fatal to their Complaint. In this matter, Plaintiffs allege that multiple Defendants participated in the same tortious conduct. For example, Plaintiffs allege that "LGES and GM were actively involved in designing, planning, and installation of ovens, ventilation systems, and safety systems and for employee training at the Warren Ultium plant," and that "Defendants jointly operated and had custody and control of the premises … and the equipment, machinery, processes and procedures" that led to Plaintiffs' injuries. (Faloba Compl. at ¶ 18.)  While under such joint operation and control, "the oven doors [were] opened for service by Defendants' employees" and that "one or more employees employed by and/or under the control of Defendants failed to close the oven doors before restarting the ovens." (*Id.* at ¶¶ 29–30.) As a result, "chemically laced fumes escaped from the ovens and inundated the areas where Plaintiffs were working," and such fumes were "not properly controlled [and] were instead directed toward the area where Plaintiffs were working" as the "result of the design, condition, and/or operation of the ventilation and emission control systems at the premises …" (*Id.* at ¶¶ 31–32.)

The Court construes these allegations as Plaintiffs plausibly alleging that each of the Defendants was independently involved in plant operations and servicing of the ovens—including GM and LGES through their individual employees. This construction is also supported by Plaintiffs' allegations that "employees who identified themselves as employees of GM or LGES or who wore vests or badges identifying themselves as such were present at the premises on a regular or daily basis," and that such "employees had responsibilities for both safety and installation/start-up

18

operations."[11]  (*Id.* at ¶ 20.)  The Court's construction is reinforced by Plaintiffs' allegations regarding Defendants' alleged duties owed, and alleged breaches thereof, in that Plaintiffs plausibly allege separate liability based on each individual defendant's role in controlling and managing the premises and serving the ovens.[12]  (*See id.* at ¶¶ 39–41.)

Similarly, Plaintiffs allege that after being evacuated on the day of the exposure, "Defendants permitted workers and contractors to return to the premises the following day with representations that the premises was safe."  (*Id.* at ¶ 33.)  Plaintiffs further allege that "Defendants LGES and GM … actively participated in decisions regarding start-up operations, including the decision to commence operations while construction was ongoing," and that "[a]t least one or more GM employees participated in investigation, air testing, and/or permitting workers to return to the premises."  (*Id.* at ¶¶ 18, 33.)  The Court construes these allegations as Plaintiffs plausibly alleging that each of the Defendants, through their employees, was actively involved in the decision to bring Plaintiffs back to work and each individually represented to Plaintiffs that the premises was safe.

---

[11] Paragraph 17 of the Complaint alleges that "Ultium's website describes multiple executives or officers at Ultium, who had and have responsibility for plant operations, as long time GM executives."  (Faloba Compl. at ¶ 17.)  GM and LGES assert that this paragraph "does not plead that these individuals are current employees of GM nor that they individually had anything to do with this incident," and argue, then, that, "even if Plaintiffs could identify the individuals who allegedly performed these unspecified tortious acts, they would, in essence, be alleging conduct on the part of Ultium Cells' employees."  (GM/LGES Faloba Reply at PageID #207.)  However, the Court need not rely on paragraph 17 to link GM and LGES's employees to this case.  Rather, paragraph 20 alleges that at all relevant times, "employees who identified themselves as employees of GM or LGES or who wore vests or badges identifying themselves as such were present at the premises on a regular or daily basis," and that such "employees had responsibilities for both safety and installation/start-up operations."  (Faloba Compl. at ¶ 20.)  Accordingly, even setting aside paragraph 17, the Court finds that Plaintiffs have sufficiently alleged conduct of GM and LGES's employees, rather than solely alleging "conduct on the part of Ultium Cells' employees."  (GM/LGES Faloba Reply at PageID #207.)

[12] GM and LGES reference in a footnote that the United States Department of Labor, Occupational Health and Safety Administration ("OSHA") only issued citations related to the incident at issue to Ultium Cells, but not to GM or LGES.  (GM/LGES Faloba Motion at PageID #143.)  The Court is not persuaded by this argument.  First, the Complaint only referencing citations issued to Ultium Cells does not necessarily mean that no citations were issued to GM or LGES.  Second, and more importantly, however, the mere fact that OSHA issued a citation to Ultium Cells and not GM or LGES does not mandate a finding that GM and LGES are without fault—particularly at this early motion to dismiss stage.

"[D]iscovery will help expose who will have any actual responsibility" by allowing Plaintiffs the chance to "reveal evidence to support" their claims and Defendants the chance to refute that evidence. *Shah*, 2024 WL 3226108, at *5; *Hale*, 2011 WL 49545, at *4. But at this stage, the Court concludes that "Defendants have adequate notice of Plaintiffs' claims and the grounds upon which they rest" based on Plaintiffs' "allegations that multiple Defendants have engaged in the same conduct."[13] *Hale*, 2011 WL 49545, at *4. Accordingly, Plaintiffs' claims "are not subject to dismissal as an improper group pleading." *Gold Crest, LLC*, 525 F. Supp.3d at 835.

### b. Whether Plaintiffs' Allegations are Conclusory Under Rule 8

Next, the Court turns to GM and LGES's assertions that Plaintiffs' allegations are conclusory under Rule 8. Specifically, GM and LGES advance two arguments. First, GM and LGES assert that

---

[13] GM and LGES cite to other cases in which "collective" allegations were found to have fallen short of Rule 8 pleading requirements. However, the Court finds these cases distinguishable for numerous reasons. First, the Court finds that in the present case, Plaintiffs allege that *each* of the individual Defendants engaged in the same tortious conduct, as opposed to only certain Defendants having engaged in the conduct and the allegations not specifying which Defendants did so. *Cf. Arnold v. Alphatec Spine, Inc.*, 2014 WL 2896838, at *4 (S.D. Ohio June 26, 2014) (rejecting collective pleading because complaint did "not provide any facts to support the allegation that *all Defendants* colluded in the alleged fraudulent scheme"). Second, having recognized that the permissibility of group pleading is "often dependent on the facts and claims at issue," the Court finds that the present case is distinguishable in that it sufficiently puts the Defendants on notice of the claims being asserted, as explained above, unlike the cases cited by GM and LGES. *See, e.g.*, *Niederst*, 2024 WL 3522413, at *4–5 (finding that complaint's allegations that defendants "*may* have participated" did not sufficiently allege that any individual defendant personally engaged in tortious conduct and was directly contradicted by exhibits attached to the complaint); *Krlich v. City of Hubbard*, 2021 WL 63279, at *6 (N.D. Ohio Jan 7, 2021) (addressing lumping specifically within the context of Section 1983 claim and concluding that lumping was insufficient because "*in a Section 1983 action*, a defendant is 'only liable for his or her own misconduct'") (emphasis added); *Alghusain v. Nemeth*, 2021 WL 4060364, at *4 (N.D. Ohio Sept. 7, 2021) (finding that the plaintiff "fail[ed] to provide any facts connecting any of the State agencies or officials to his purported civil rights claims"); *Phillips v. Johnson and Johnson*, 2024 WL 1765583, at *2–3 (N.D. Ohio Apr. 24, 2024) (finding Rule 8 pleading requirements not met because pro se plaintiff's "263-page complaint purports to be a story of his life, including the alleged wrongs that have been committed against him by several of the defendants from 1995 to present day," "[p]laintiff's factual allegations are vague, conclusory, and at times, illegible or incomprehensible," and concluding that "[t]his [c]ourt and the defendants are left to guess at basic elements of [p]laintiff's purported claims"); *Hall v. Madison Police Dep't*, 2018 WL 5775914, at *1–2 (N.D. Ohio Nov. 2, 2018) (granting unopposed motion to dismiss because plaintiff's allegation did "not amount to a sufficiently pleaded allegation, but is a legal conclusion that provides no information regarding what actions any Lake County Sheriff Deputy' [sic] took or how Lake County was at all involved with the facts surrounding the instant case"). These cases are factually distinguishable from the present case where, as discussed above, Plaintiffs set forth sufficient information to put GM and LGES on notice of their claims.

the Complaint "fail[s] to say what activities LGES or GM specifically directed or influenced." (GM/LGES Faloba Reply at PageID #208.)  Second, GM and LGES submit that Plaintiffs' allegations regarding the allegedly breached duties owed to Plaintiffs are a "mere recitation of the elements of negligence," and that a "pleading that offers 'labels and conclusions'" fails Rule 8 pleading requirements.  (*Id.* at PageID #208–09.)

As a preliminary matter, the Court rejects the assertion that Plaintiffs have not set forth that GM or LGES "directly influenced, participated in, or directed the alleged tortious conduct."  (*Id.* at PageID #208.)  The Court has already discussed Plaintiffs' allegations regarding control of the premises, service to the ovens, and the instructions that Plaintiffs could safely return to the premises as they relate to GM and LGES.  *See* Section IV.A.2.a.  The Court finds that these allegations plausibly allege that "GM or LGES directly … participated in … the alleged tortious conduct."[14] (GM/LGES Faloba Reply at PageID #208.)

---

[14] GM and LGES cite to case law for the proposition that a "party's general presence and influence on the conduct of another … does not constitute tortious conduct in its own right under the personal participation theory, without other allegations of direct involvement." (GM/LGES Faloba Reply at PageID #207.)  However, Plaintiffs' do not merely allege that GM and LGES "influenced" the conduct of another, and GM and LGES admit that "Plaintiffs here do not plead" this theory.  (*Id.* at PageID #207.)  Rather, as previously discussed, a liberal construction of the Faloba Complaint demonstrates that Plaintiffs allege that GM and LGES, through their employees and agents, were directly involved in the alleged tortious conduct relating to the control of the premises, service to the ovens, and instructions that the premises was safe for return.  *See* Section IV.A.2.a.  Accordingly, the Court finds that GM and LGES's arguments regarding "influencing the conduct of another" are not relevant here.

Moreover, GM and LGES's cited authority is wholly distinguishable from the present case.  GM and LGES cite to *Mondello v. Power Home Solar, LLC*, 2023 WL 6311463 (N.D. Ohio Sept. 28, 2023), regarding a "party's influencing the conduct of another" under the personal participation theory.  (GM/LGES Howdershelt Reply at PageID #170–71; GM/LGES Antos Reply at PageID #162–63.)  *Mondello* involved claims against a company for allegedly false marketing, where additional individual liability was sought against the company's founder for allegedly developing the marketing tactics.  *Mondello*, 2023 WL 6311463, at *1, 8.  However, the court rejected that argument because the allegations did not suggest that the founder interacted with plaintiffs during the sale, or even that the founder directed the employee who made the sale to use the tactics at-issue.  *Id.* at *8.  Thus, *Mondello* is distinguishable from the present case, in that Plaintiffs allege that service to the ovens was directly conducted by all three Defendants through their employees.  (*See* Faloba Compl. at ¶ 29.)

The Court next turns to GM and LGES's arguments regarding recitation of the elements of negligence and conclusory allegations.  Rule 8 requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Bechak v. Chang*, 2015 WL 8527416, at *1 (N.D. Ohio Dec. 11, 2015).  While "[s]pecific facts are not necessary," a complaint must "give the defendant fair notice of what the … claim is and the grounds upon which it rests."  *Id.*  Thus, a complaint must contain "more than labels and conclusions" and a "formulaic recitation of the elements of a cause of action will not do."  *Id.*; *see also Stuart v. Lowe's Home Centers, LLC*, 737 Fed. App'x 278, 281 (6th Cir. 2018) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

An examination of cases within this circuit helps demonstrate this distinction between complaints that comply with Rule 8 and complaints that do not.  *Compare Stuart*, 737 Fed. App'x at 281–82 (finding that allegations in complaint were insufficient to survive motion to dismiss), *with Bechak*, 2015 WL 8527416, at *1–2 (finding that complaint met plausibility requirements of Rule 8).

In *Stuart*, the court evaluated whether a complaint sufficiently alleged gross negligence and intentional infliction of emotional distress.  737 Fed. App'x at 281.  Regarding the claim for gross negligence, the complaint merely alleged, without further explanation, that the defendant "demonstrated wanton and extreme reckless conduct with regard to the rights of the Plaintiff and such reckless indifference to his welfare and his reputation constitutes gross negligence."  *Id.*  Similarly, for the intentional infliction of emotional distress claim, the complaint simply alleged that the "actions of the Defendant were intentional and/or reckless" without specifying anything further. *See id.* ("What conduct? What actions? The complaint does not say.").  Thus, the court concluded that

dismissal was appropriate because the complaint contained "recitations of the elements of the claims" and "conclusory statements as to why those elements are met." *Id.* at 281–82.

Conversely, in *Bechak*, the court concluded that the plaintiff's complaint satisfied the pleading requirements of Rule 8. 2015 WL 8527416, at *2. There, the court rejected the argument that the plaintiff had set forth only a "formulaic recitation of the elements." *Id.* Instead, the court determined that the plaintiff set forth "specific factual allegations describing [the defendant's] role in the purported mishandling, deterioration, and misidentification of the waste that is alleged to have created the explosive condition of the material." *Id.* In evaluating the motion to dismiss, the court explained that the "cause of the explosion, the role of each defendant, and the extent of each defendant's duty or responsibility concerning the material and the alleged injuries cannot be definitively established at this stage in the matter." *Id.* However, after "consider[ing] the [c]omplaint in a light most favorable to the [p]laintiff," the court concluded that the complaint "contain[ed] 'more than labels and conclusions' or a 'formulaic recitation of the elements of a cause of action' and [was] therefore sufficient." *Id.*

The Court finds the present case to be more analogous to *Bechak* and concludes that Plaintiffs have satisfied the plausibility requirements of Rule 8. Like *Bechak*, Plaintiffs allege specific factual allegations regarding their case, including that: (i) GM and LGES were "actively involved in designing, planning, and installation of ovens, ventilation systems, and safety systems and for employee training at the [premises] … and actively participated in decisions regarding start-up operations, including the decision to commence operations while construction was ongoing"; (ii) "employees who identified themselves as employees of GM or LGES or who wore vests or badges identifying themselves as such were present at the premises on a regular or daily basis … [and] had

responsibilities for both safety and installation/start-up operations"; (iii) "Defendants jointly operated and had custody and control of the premises" … [including] the equipment, machinery, processes and procedures involved in and resulting in Plaintiffs' injuries"; (iv) "[d]uring operation of the ovens … the oven doors [were] opened for service by Defendants' employees"; (v) "[f]ollowing such service to the ovens, one or more employees employed by and/or under the control of Defendants failed to close the oven doors before restarting the ovens"; (vi) as a result of the ventilation systems that GM and LGES were "actively involved in designing, planning and install[ing]," the "hazardous and noxious fumes were not properly controlled, but were instead directed toward the area where Plaintiffs were working" thereby "causing them to be exposed to and inhale various hazardous and noxious fumes"; (vii) the day after the exposure, "Defendants permitted workers and contractors to return to the premises … with representations that the premises was safe"; (viii) "[a]t least one or more GM employees participated in investigation, air testing, and/or permitting workers to return to the premises"; (ix) following the chemical exposures, Defendants "wrongfully withheld and refused to provide critical data concerning the identity and nature of the chemical exposure."  (Faloba Compl. at ¶¶ 18, 20–21, 29–34.)

Moreover, the Faloba Complaint does not simply recite the bare elements of a negligence claim as was the case in *Stuart*.  Rather, the Faloba Complaint sets forth specific breaches of duties that GM and LGES allegedly owed, and indicates that such negligence includes, but is not limited to: (i) "negligence in design, installation, and/or operation of the coating ovens"; (ii) "failure to develop, document and implement procedures for control of hazardous chemicals"; (iii) "failure to train employees and implement appropriate safety procedures"; (iv) "failure to provide appropriate safety measures and equipment including proper ventilation and control interlocks"; (v) "commencement

24

of operation in proximity to plaintiffs"; (vi) "failure to inspect and monitor working conditions, including air quality"; (vii) "failure to warn of latest [sic] hazards"; (viii) "failure to provide information, including, but not limited to, material safety data sheets"; and (ix) "negligence in permitting Plaintiffs to return to the premises prematurely." (*Id.* at ¶ 41.) Again, Plaintiffs include and point to specific allegations in the Faloba Complaint to support their negligence claim.

Here, the exact cause of the release of toxic fumes and allegedly deficient servicing of the ovens, the role of each defendant, and the extent of each defendant's duty or responsibility concerning the incident and the alleged injuries "cannot be definitively established at this stage in the matter." *Bechak*, 2015 WL 8527416, at *2. "[D]iscovery will help expose who will have any actual responsibility." *Shah*, 2024 WL 3226108, at *5. But the specific factual details alleged in the Faloba Complaint are "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," and are sufficient at this stage in the proceeding. *Bechak*, 2015 WL 8527416, at *2. Accordingly, the Court finds that dismissal of Plaintiffs' negligence claims against GM and LGES is not warranted.

### C.    Joint Venture

Finally, the Court turns to the parties' arguments regarding the allegations that GM and LGES are liable by virtue of their alleged participation in a joint venture.

In their Motion, GM and LGES assert that Plaintiffs "attempt to hold LGES and GM responsible for any alleged wrongdoing on behalf of Ultium Cells, by 'virtue of their participation in a joint venture,' but fail to address the fact that Ultium Cells is an LLC and GM and LGES are merely members of the sole member of Ultium Cells." (GM/LGES Faloba Motion at PageID #143.) Specifically, GM and LGES contend that an LLC is an "independent legal entity which has legal

25

rights and obligations, differentiating it from a joint venture," and that courts frequently distinguish between LLCs and joint ventures.  (*See id.* at PageID #144–45.)  GM and LGES submit that the Complaint alleges that Ultium Cells is a joint venture of GM and LGES when it is in-fact an LLC, and thus, "Plaintiffs' repeated allegations to Ultium Cells being a joint venture of GM and LGES is meaningless."  (*Id.*)

In their Opposition, Plaintiffs assert that "[u]nder Ohio law where two or more parties engage in a joint venture for a common purpose, the negligence of each joint venturer will be imputed to the other."  (Faloba Opposition to GM/LGES at PageID #188.)  Plaintiffs characterize GM and LGES's arguments as "not disput[ing] that Plaintiffs plausibly allege a joint venture," but rather "argu[ing] that the existence of a joint venture does not vitiate the protections of § 1706.26."  (*Id.* at PageID #189.)  Plaintiffs submit that § 1706.26 "does nothing more than insulate a member from liability based <u>solely</u> upon such membership."  (*Id.* (emphasis in original).)  Plaintiffs next broadly assert that GM and LGES's cases involve a range of issues not relevant to this case, and that none of the cases "addressed the tort liability of joint venturers to third parties."  (*Id.*)  Accordingly, Plaintiffs contend that their Complaint "more than suffices to identify both GM's and LGES's involvement as joint venturers who contributed their 'best manufacturing processes,' and 'product design and process.'" (*Id.* at PageID #189–90.)

In their Reply, GM and LGES dispute Plaintiffs' characterization of their argument, asserting that they "openly, and directly, dispute that Plaintiffs have plausibly alleged a joint venture." (GM/LGES Faloba Reply at PageID #206.)  GM and LGES assert that a joint venture is "not an entity established under state law," and that many courts have held that corporations, partnerships, and limited liability companies are not joint ventures.  (*Id.* at PageID #205–06.)  Thus, because Ultium

26

Cells is an LLC, GM and LGES submit that it cannot be a joint venture. (*Id.* at PageID #205.) GM and LGES further contend that the "simple references to 'joint venture' and 'collaboration' on the Ultium Cells' website" do not change this conclusion, as those references at most are intended to explain to the public the ownership structure of Ultium Cells. (*Id.* at PageID #206.)

Under Ohio law, "[a] joint venture arises from a contractual association of parties with the common purpose of carrying out a single business venture for their mutual profit, for which they combine their efforts, property, money, skill and knowledge *without creating a partnership or a corporation.*" *Kahle v. Turner*, 420 N.E.2d 127, 130 (1st Dist. 1979) (emphasis added); *Domo v. Stouffer*, 580 N.E.2d 788, 791 (6th Dist. 1989) (emphasis added). Ohio courts have specified that "the [joint venture] relationship does not have the formality of a partnership or a corporation …"[15] *Kahle*, 420 N.E.2d at 130; *Emery Oil Company, Inc. v. Merchant Sampler Advertising Co.*, 1980 WL 352956, at *3 (1st Dist. July 23, 1980); *Clark v. Clark*, 1982 WL 4836, at *3 (1st Dist. Nov. 24, 1982); *see also Domo*, 580 N.E.2d at 791 ("Joint ventures have been distinguished from more formal relationships such as partnerships since the former relate to a single transaction as opposed to a continuing business."). Rather, "[f]undamentally, '[a] joint venture is a *contractual* association in

---

[15] Other federal and state courts have reached the same conclusions when analyzing similar non-Ohio law. *See, e.g.*, *U.S. v. RG Steel Wheeling, LLC*, 2012 WL 3647717, at *3 (N.D. Wv. Aug. 23, 2012) ("As a matter of federal common law, '[a] joint venture and a corporation are mutually exclusive ways of doing business' and even '[t]hough business associates may be treated as partners vis-à-vis one another even when they operate through a corporation, the corporate form is to be respected in dealings with third parties.' This holding easily translates to limited liability companies …") (citations omitted); *Ken Mills Engineering Ltd v. Bulk Handling Systems*, 2011 WL 690190, at *3 (M.D. Tenn. Feb. 16, 2011) ("A limited liability company is different from a joint venture, however … [u]nder Oregon law, limited liability companies and joint ventures are two different business entities."); *Peabody-Waterside Development, LLC v. Islands of Waterside, LLC*, 995 N.E.2d 1021, 1024 (Ill. App. Ct. 2013) ("A limited liability company (LLC) is a legal entity distinct from its members. It is an independent legal entity which has legal rights and obligations, differentiating it from a joint venture. Joint ventures are not distinct legal entities …").

which the parties intend to carry out a common purpose.'"  *Schlaegel v. Howell*, 42 N.E.3d 771, 777

(2d Dist. 2015) (citing *Nilavar v. Osborn*, 711 N.E.2d 726, 738 (2d Dist. 1998)) (emphasis added).

The Court concludes that Ultium Cells is not a joint venture.  As correctly noted by GM and

LGES, Ultium Cells is a formal limited liability company.  (*See* Ex. 1, GM/LGES Faloba Motion at

PageID #152.)  Plaintiffs do not dispute this and admit that "Defendant Ultium Cells LLC is a

business entity licensed to do business in the State of Ohio …"  (Faloba Compl. at ¶ 13.)  Because a

joint venture "does not have the formality of a partnership or corporation," and is instead "a

contractual association," Ultium Cells cannot be a joint venture as it is an LLC—and thus a formally

established legal entity.[16]  *Kahle*, 420 N.E.2d at 130; *Schlaegel*, 42 N.E.3d at 777.  Indeed, Plaintiffs

do not assert that the alleged joint venture "arises from a contractual association of parties" as required

under Ohio law[17]—rather, Plaintiffs merely reiterate their conclusory allegation that Ultium Cells is

a joint venture.

---

[16] Although *Kahle* referenced the "formality of a partnership or corporation" rather than an LLC, Ohio courts frequently apply the rules of partnerships and corporations to LLCs.  *See, e.g.*, *Dexxon Digital Storage, Inc. v. Haenszel*, 832 N.E.2d 62, 69 (5th Dist. 2005) ("[G]iven that an LLC has some of the attributes of a corporation and some of a partnership, an LLC should be governed by the same rules that apply to those entities."); *William E. Weaner & Associates, LLC v. 369 West First, LLC*, 2020 WL 118611, at *5 (2d Dist. Jan. 10, 2020) ("The same comment would apply to LLCs, which are a hybrid of a close corporation and a partnership."); *Holdeman v. Epperson*, 2005 WL 1714210, at *5 (2d Dist. July 22, 2005) (agreeing that "because an LLC had some attributes of a corporation and also had some partnership attributes, the logical approach would be to use rules typically applied to these entities").  Accordingly, any distinctions between a joint venture and a corporation "easily translates to limited liability companies …"  *RG Steel Wheeling, LLC*, 2012 WL 3647717, at *3 (finding that "[a]s a matter of federal common law, '[a] joint venture and a corporation are mutually exclusive ways of doing business'" and that such "holding easily translates to limited liability companies").

[17] "Formation of a joint venture requires four elements: (1) a joint contract, either express or implied, to engage in a specific business enterprise; (2) an intention to associate as joint venturers; (3) a community of interest and joint control; and (4) an agreement to share jointly and severally in profits and losses."  *Howard, Administrator of the Estate of Sean David Howard, Sr. v. Szozda*, 224 N.E.3d 1259, 1262 (6th Dist. 2023).  In addition to their failure to address the fact that a joint venture lacks the formality of other formally established business entity structures under Ohio law, Plaintiffs fail to plead any "joint contract … to engage in a specific business enterprise."  *Id.*  Accordingly, Plaintiffs' joint venture argument also fails on this basis.

Further, this determination is not undermined by the allegations that the Ultium Cells website includes references to a "joint venture" and "collaboration."  In *Domo*, the court concluded that "by legal definition, the parties were not engaged in a joint venture."  580 N.E.3d at 791.  That determination was unaffected by the fact that the parties "refer[red] generally to their business relationship as a joint venture."  *Id.*  Here, in similar fashion, the mere references to a "joint venture" and "collaboration" on the Ultium Cells website—intended to simplify Defendants' ownership structure to the public—do not remedy the fact that joint ventures do "not have the formality" of established legal entities such as LLCs.  *Kahle*, 420 N.E.2d at 130.  Nor do those references remedy Plaintiffs' failure to plead "a joint contract … to engage in a specific business enterprise" as required by Ohio law.  *See Howard, Administrator of the Estate of Sean David Howard, Sr. v. Szozda*, 224 N.E.3d 1259, 1262 (6th Dist. 2023); *see also Schlaegel*, 42 N.E.3d at 777.

Accordingly, the Court rejects Plaintiffs' assertions that "Ultium Cells LLC … [is] a joint venture of Defendant [GM] and Defendant [LGES]."  (Faloba Compl. at ¶ 14.)  However, notwithstanding this conclusion, Plaintiffs' negligence claims survive dismissal at this stage for the reasons stated above relating to the personal participation theory.  *See supra* Section IV.B.

## V.     Conclusion

For the reasons set forth above, the Court **DENIES** the GM/LGES Faloba Motion.

**IT IS SO ORDERED.**


 *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  April 8, 2025                    U. S. DISTRICT JUDGE

29